## MARY P. BROOKFIELD, Respondent, v. DRURY COLLEGE, Appellant.

Springfield Court of Appeals, December 6, 1909.

1. CONTRACT OF EMPLOYMENT: Statute of Frauds: Evidence Held Insufficient to Establish Contract. Plaintiff was elected to the position of Dean of Women at Drury College, which position she filled for one year. Before the beginning of the second college year her resignation was called for. Her suit for damages for breach of contract is founded on the claim that she had been employed for the second year. The evidence is examined and held insufficient to show a contract of employment covering the second year; and it is further held that evidence of an alleged oral contract of employment was inadmissible, for such contract would not have been valid under the Statute of Frauds, it appearing under plaintiff's testimony that the employment under the oral contract would not have been completed within one year from the making thereof.

2. ————: ————: Writing Must Contain Entire Contract. In a contract of hiring, the time the employment should commence, when it should end, how and when the payments were to be made, and the nature of the services to be performed should be stated. The memorandum must contain the entire contract and cannot be pieced out by parol evidence.

3. ——: ——: In a parol contract of employment, the fact that the services could have been completed within one year after such services were to be commenced does not relieve the contract from the effect of the Statute of Frauds. The year designated by the statute commences from the date of the agreement.

4. ——: **Effect of Indefinite Hiring.** An indefinite hiring at so much per day or per month or per year is a hiring at will and may be terminated by either party at any time and no action can be sustained in such case for wrongful discharge.

5. **EVIDENCE: Admissions.** The law of evidence as to admissions and statements of a party to the record and in interest when made contrary to his attitude on the trial or as to admissions negativing the averments made in his petition, is that such admissions are competent evidence against him whenever or wherever made.

6. ——: ——. Where a party believes a fact to be true without any personal knowledge thereof upon evidence sufficient to convince him of its truth, his statement of such fact .if against his interest, is admissible.

7. ——: ——: **Conclusions.** Although it is not competent for a party to give her conclusions as to what the contract was and thereby bind the defendant, yet, having stated her conclusions, this was evidence against her.

Appeal from Greene Circuit Court.—*Hon. James T. Neville,* Judge.

REVERSED.

*V. O. Coltrane* for appellant.

(1)   An indefinite hiring at a stipulated sum per year is a hiring at will, and may be terminated by either party at will. The burden is on the plaintiff to show a special contract for one year. The fact of a writing raises no presumption that there is a contract for one year. Boogher v. Insurance Co., 8 Mo. App. 533; Finger v. Koch, etc., Co., 13 Mo. App. 310; Harrington v. Brockman Com. Co., 107 Mo. App. 418; Evans v. Railroad, 24 Mo. App. 114.   (2)   A proposal in writing which is so indefinite that it cannot form the basis of a contract

without further specification, or that is so indefinite that equity could not decree a specific performance of it, and an acceptance of such proposal, does not make it a binding contract. Lee v. Dodd, 20 Mo. App. 271, 281; 26 Am and Eng. Ency. of Law (2 Ed.), 32; Campbell v. Handle Co., 117 Mo. App. 19. (3) The interpretation of this resolution as a proposal is a matter of law for determination by the court and not a question of fact. Whedon v. Ames, 28 Mo. App. 248. (4) There is absolutely nothing in the evidence to justify the finding that her employment was to end with commencement day, it was not to be performed within one year from the making of the contract, as that day was five days more than a year after the day on which the alleged contract was made. Rose v. Carbonating Co., 60 Mo. App. 28; Laing v. Holmes, 93 Mo. App. 231; Biest v. Ver-Steeg Shoe Co., 97 Mo. App. 137. (5) The agent's authority must come from the trustees or directors assembled as a board and cannot legally result from the assent of a majority given singly when not thus assembled. 2 Cook on Corporations (5 Ed.), p. 1828, sec. 726; Cann v. Rector, 111 Mo. App. 164; Cann v. Rector, 121 Mo. App. 201. (6) The statute of frauds requires that the whole contract shall be set out either in one writing, or if more than one writing that one must refer to the other so as in effect to embody in itself the paper referred to without the aid of parol proof to effect such union. And the writing must contain the substantial terms of the contract. Kelly v. Thuey, 143 Mo. 422; Hain v. Burton, 118 Mo. App. 577; Darnell v. Lafferty, 113 Mo. App. 282.

*Sebree, Farrington, Pepperdine & Wear* for respondent.

(1) When the contract is one of re-employment the terms do not have to be set out anew, but the terms of the old employment are presumed to continue unless changed. Embry v. Dry Goods Co., 127 Mo. App. 383;

Woodall v. Davis-Creswell Mfg. Co., 48 Pac. Rep. 670. (2) It is what was done, not what a party may have secretly thought or intended. Brewington v. Mesker, 51 Mo. App. 348; Machine Co. v. Criswell, 58 Mo. App. 470. (3) If plaintiff accepted terms proposed by the board what she may have thought about the time when her services might end is not material. Embry v. Dry Goods Co., 127 Mo. App. 383. (4) The demands of the statute may be met by any number of documents, telegrams, writings and entries. Peycke Brothers v. Ahrens, 98 Mo. App. 456. (5) Although the contract of employment may be indefinite as to length of time, yet if it may be performed in a year it is not vitiated by the Statute of Frauds. Matthews v. Wallace, 104 Mo. App. 96. (6) The law says, "It is not the object of the statute to confer a personal privilege upon a party to enable him to become recreant to his contract, but to prevent others from forcing a spurious contract upon him by false swearing." Cash v. Clark, 61 Mo. App. 636; Cunningham v. Wilson, 43 Mo. App. 629.

STATEMENT.—It becomes necessary in this case, in order to determine whether the demurrer to the evidence should have been sustained by the trial court, to consider substantially all the evidence in the case.

The plaintiff first introduced in evidence the Articles of Association and By-Laws of Drury College. The portions thereof which appear to be material to the questions involved in this case are as follows:

### "ARTICLE I.

"Be it known that we, the undersigned, do hereby on this 29th day of July, A. D. 1873, organize and constitute ourselves a body corporate and politic, under the provisions of Article VIII of Chapter 37 of Wagner's Missouri Statutes, for the purpose of promoting the higher education and Christian culture, by founding and forever maintaining a school of liberal learning and

agree to be known and styled as Drury College, . . . maintaining and conducting a college of liberal learning. All of which said powers, together with all other powers now conferred, or which may be hereafter conferred upon said corporation by law, shall be vested in and exercised by a Board of Trustees to be appointed as hereinafter provided, and by their successors in office."

## "Article III.

"The board of trustees of Drury College shall consist of twenty members, besides the President of the College, who shall be a member ex-officio. . . .

"All vacancies in the board of trustees shall be filled at the annual meeting of the board. Seven members of the board of trustees shall constitute a quorum for the transaction of business.

"The board of trustees of Drury College shall have power to appoint a President of said College, and all other officers, instructors, agents and servants necessary for the successful conduct of its affairs; to establish the terms of their respective offices or service, to determine their duties, fix their compensation, and remove them when the interest of the College shall require it, and appoint their successors.

"The board of trustees shall also determine the course of study and instruction to be pursued in the College or any of its departments, and ordain the necessary by-laws and regulations for the government and direction of all officers, instructors, students and servants of the College, and for the general management of all its affairs.

"The annual meeting of the board of trustees of said Drury College shall be held on the Wednesday immediately preceding the Thursday in June on which occurs the annual commencement of said College in each and every year."

"ARTICLE IV. . . .

*"Faculty.*

"The President of the College shall also be President of the Faculty of Instruction for the College.

"The board of permanent instructors in the College shall constitute the College Faculty.

"Under the general direction of the board of trustees, the Faculty of the College shall arrange the plan of instruction in the College; prepare the requisite code of regulations for the government of the students, administer the discipline of the College, and be held responsible for the right performance of its educational work."

"BY-LAWS. . . .

"ARTICLE II.

*"Annual Meeting.*

"The annual meeting of the College shall be held in Springfield, Missouri, on the Wednesday immediately preceding the Thursday in June on which occurs the annual Commencement of said College in each and every year, for the election of trustees and officers and for the transaction of other business."

The deposition of Mary P. Brookfield, the plaintiff, was then offered in evidence. "Defendant objected to such portions of said deposition as pertained to the contract between the plaintiff and defendant for the reason that the alleged contract was not to be performed within one year, and sets up an oral contract. Defendant objected especially to the resolution set forth in said deposition as irrelevant, incompetent and immaterial to this case, and bears no semblance to a contract of employment; because it lacks every essential to a contract of employment; because there are no parties to a contract of employment; because there are no duties to be

performed, and no compensation to be paid, and no subject-matter as far as the contract of employment is concerned; and as a contract of employment it is unilateral, inasmuch as it doesn't bind the plaintiff, and tends in no way to prove the issues in this case, and it shows upon its face what it is; that instead of being a contract of employment it is an effort on the part of the board of trustees to set right some difficulties that had occurred between the President of the College on one side and the Faculty on the other; that the subject of the proclamation of June 6th is an effort to set right a state of affairs that had arisen between the President and the Faculty, and not a contract of employment between this plaintiff and the board of trustees."

The foregoing objections of the defendant were by the court overruled and exceptions saved.

Those portions of the testimony of Mary P. Brookfield which are deemed material to a determination of the questions presented on this appeal are as follows:

"Q. 1. State your name, residence and occupation? A. 1. My name is Mary P. Brookfield, and for the past several months my residence has been Unionville, Michigan. My occupation is that of a teacher, having been engaged in such work eighteen years.

"Q. 2. Where did you live during the fall of 1906 and part of the year 1907, and what, if any connection did you have with Drury College during that time? A. 2. I lived in Springfield, Missouri, and held the position of Dean of Women at Drury College in that city.

"Q. 3. Please state by whom you were employed, the terms of your employment, and your duties? A. 3. In the early part of May, 1906, I was at the University of Chicago, where I was living as a graduate student, when Dr. Kirbye, who was then President of Drury College, called on me and on behalf of the College offered me the position of Dean of Women at a salary of $1,000 per year, and a home at McCullagh Cottage. I took the matter under advisement and some time in June of that

year I was notified by President Kirbye that I had been elected to this position by the Board of Trustees of the College at its annual meeting on June 6th, and I telegraphed him that I would accept it.  My agreement with President Kirbye was that I was employed for two years, but afterwards learned that no time was stipulated on the College record.  The duties of that position required that I should have charge of the young ladies in the College, the professional supervision in regard to their studies, and the teaching of English Literature.

"Q. 5.  When did you first assume your position at Drury College and what were your duties?  A. 5. After I was notified of my election by the trustees, I made preparations during the summer to come to Springfield, and reached there September 4th, about eight days before the school opened.  I had charge of above mentioned department from that time on.

"Q. 6.  How long did you remain in the College, and how was your salary paid?  A. 6.  I remained at the College from September 4th, 1906, until about the 21st of June, 1907, when I came away on my vacation, leaving most of my personal belongings in my rooms at the College.  My salary was paid monthly at the expiration of each month.

"Q. 7.  What arrangement, if any, did you have with the College authorities, the board of trustees, in reference to continuing your work in the College during the years 1907 and 1908?  A. 7.  At the annual commencement in June, 1907, I made my report to the board of trustees for the year's work, and also submitted the plans for the next year.  There were a number of questions asked me in regard to my work, which I discussed with them, and I gave to each trustee a copy of the rules and regulations as I had worked them out, and which I intended to put into effect the following year, and these were approved by those present.  Dr. Wray, one of the trustees, called at McCullagh Hall after commencement and I showed him over the building, told him of the

plans and improvements I hoped to work out, and he stated that he felt very optimistic over the coming year, and was glad I had charge of it.

"Q. 8. Please state if you met the board of trustees at its annual meeting in June, 1907, and what, if any, action was taken by the board with reference to continuing you in your position during the following year? A. 8. On the 5th of June, 1907, the day I made my report to the board, they made up their committees for the coming year, and I was appointed on the Committee of Conservatory of Music and Art Department. On the following day I was called before the board of trustees with the other members of the faculty, and either Mr. Benedict or Mr. Mills of St. Louis, I am not sure which, read a set of resolutions to us, which he stated was the final decision of the board relating to the troubles of Drury College, and the re-engagement of the members of the faculty. A copy of these resolutions was within a few days delivered to me by Mr. Calland, the Secretary of the College. After such resolutions were read informing us of the board's wishes, and I, being desirous of continuing my employment in the College, consented to remain and continued my preparations for the ensuing year's work. I talked later with several members of the board concerning the next year's work and agreed with them that the outlook was most encouraging.

"Q. 9. Have you a copy of the resolutions given you, and will you make them a part of your deposition? A. 9. . . . I have here, however, a copy of the resolutions given me by Mr. Calland, marked Exhibit "A" which I ask to be made a part of this deposition.

"Q. 11. When and how did you first learn that there was any dissatisfaction with you on the part of the Trustees or any of the College authorities and state briefly what, if any, action you took on receiving this information? A. 11. The first intimation I had of any trouble was when I recived a letter from Prof. Sheppard,

who was acting President of the College, Mr. Calland, Secretary, and Mr. White, Chairman of the Executive Committee, advising me that in accordance with instructions received from the board of trustees at its meeting in St. Louis on June 18th they believed the best interests of the College would be served by asking for my resignation. . . . On July 20th, Dr. Sheppard wrote me another letter, stating that he had been directed by the Executive Committee to notify me that my work at Drury College was ended. Later on, I received another letter from Mr. Sheppard, acting President, W. C. Calland, Secretary, stating that the Executive Committee had voted a meeting on July 27th, 1907, to notify me that my services would not be required after September 1, 1907.

"Three letters were produced by plaintiff as Exhibits 'B,' 'C,' and 'D,' and are hereto attached.

"Q. 14. State whether or not you were prepared and willing to assume your duties and fill the position you had formerly held at Drury College in September last? A. 14. I was ready and willing at all times to carry out my contract. I was advised that a quorum of the Board of Trustees met at Springfield on the 17th of August and formally discharged me. School was to open on the 12th of September, and I went to Springfield, reaching there on the 5th of September, 1907, and was ready then to take up my duties, but found that Miss Wingo had been employed as Dean of Women and had been installed in my rooms. . . .

"Q. 15. Please state whether or not you have been able to obtain another position as teacher since your dismissal from Drury College? A. 15. It is rarely possible to obtain employment as a teacher late in the summer for the following year; it is the universal custom for the school authorities to make their arrangements for teachers for the following year in May or June, and unless in case of a vacancy caused by death or resignation or something of that kind, it is difficult

to get a position, and in my case I have been unable to do so.

"Q. 16. Have you earned anything in the line of your profession or otherwise, and do you know of any position open for you for the balance of this school year? A. 16. I have not earned anything and do not know of any position in my line of profession that is open to me. I have made several applications, but was unable to obtain employment on account of lateness of the season.

"Q. 17. What do you consider a reasonable value to you per month of the home provided you while you were a teacher at Drury College? A. 17. This position carried with it two very comfortable rooms, with heat and light, my board and also laundry bills. It was worth at least $40.00 per month. I am quite sure that the same accommodations could not be had for less.

"Q. 18. After the annual meeting of the board of trustees in June, 1907, when this resolution was passed, what, if anything, did you do toward continuing your work for the coming year? A. 18. I wrote to all of the students who had formerly been at McCullagh Hall and sent them a copy of the rules and regulations that I had prepared and had printed; I also assigned them rooms for the next year, and wrote to a number of others who had inquired regarding the College. During the three weeks I remained at the College after Commencement, I did everything I could and which I thought it my duty to do as a member of the faculty of Drury College to have everything ready in my department to carry on the school work for the coming year."

*"Cross-Interrogatories.*

"Q. 1. If in answer to the third interrogatory propounded by the plaintiff you say that you were employed during part of the year 1906 and 1907 by Drury College, state whether, if you know, there was a record made on the records of the proceedings of the board of trustees of the College showing the time and terms

of the employment.  State when your work was to begin under the agreement for 1906-7 and how long it was to continue?  How long did your work continue under that agreement?  When did your work end under the first agreement?  Up to what time did you draw your salary under that first agreement?  A.  1.  I have never seen the records of Drury College, and the only information I have so far as my employment is concerned was that I was informed by Prof. Weaver and others that Mr. Calland had by mistake recorded my engagement for one year at a thousand dollars and a home, confusing the entry of that of Miss Mary Thompson, an academy teacher, whose engagement should have read for one year, while mine should have been recorded for two.  Under the engagement for 1906-7 my work was to commence not later than September 5, 1906.  I reported at the College for work September 4th.  My work was to continue for two years.  I performed all of my duties faithfully, writing the last letter during the last week in August, 1907, to a young lady who had written to inquire about possible accommodations at McCullagh Hall for the ensuing year.  My understanding would be that my first year under the agreement did not end until the opening of the school in September, 1907.  I did not receive the last payment of my salary on the first year's work until some time in October, 1907, when it was paid my counsel.

"Q.  8.  If in answer to the seventh interrogatory of the plaintiff you describe an agreement that you had with the trustees of Drury College with reference to your work during the years of 1907 and 1908, state when that agreement was had, giving the day of the month and the year?  A.  8.  The last agreement made by me with the board of trustees relative to the continuance of my services in the College as Dean of Women occurred during the annual session of the board of trustees held on June 5th and 6th, 1907.

"Q.  9.  State who was present when the agreement was entered into, or that arrangement made?  A. 9.  As far as I know, all of the trustees and practically all the faculty.

"Q. 10.  State the place where it was made? A.  10.  In the Classical Room of the first floor of Pierson's Hall, and the agreement was ratified and confirmed by Dr. Wray in McCullagh Hall the following day and different members of the board that evening at the banquet.

"Q.  11.  Was the agreement verbal or in writing? A.  11.  It consisted of both.

"Q.  12.  If it was in writing please attach a copy of it to your deposition?  A.  12.  I have attached a copy of the resolutions to my depositions, which is the only writing showing my retention so far as I know.  As I understand, the board of trustees have never been in the habit of making written contracts as do other colleges.  I base this statement upon the fact that Mr. Weaver, when first coming to Drury College requested a written contract, and Mr. Calland, Secretary, told him that no written contract of employment of teachers were ever made by Drury College; that the election at annual meetings was final.

"Q.  13.  If it was verbal, please state which of the College authorities (giving their names) made the agreement with you, stating as fully as you can what was said by you and by the College authority, giving the language used by each?  A.  13.  It would be impossible to narrate fully a conversation had with Dr. Wray, a member of the board, on Friday morning, June 7, 1907, which lasted for fully an hour, all of which time my employment and plans for the coming year, were discussed.  I remember, though, definitely that he said he was well pleased to know that I was to be there, and said:  'I am very optimistic over the coming year's work.'.  He also said that the work of the Board the day before was deliberate in setting their faces against any

disintegration or change in the faculty. Dr. Lewis also told me on Thursday, June 6th, that the fight was ended; also said: 'There are to be no changes. We threshed at it until the entire board was a unit.' . .

"Q. 14. When was your work to begin under that arrangement, and how long was it to continue? A. 14. My work was to continue until the opening of school in September, 1908. I did not consider that my work had ended and would not until September, 1908.

"Q. 14a. Up to what time were you to draw your salary under the new agreement? A. 14a. As long as my work lasted.

"Q. 16. If the answer to the eighth interrogatory propounded by the plaintiff you state that you were present at the annual meeting in June, 1907, and that action was taken by the board of trustees on that occasion, state if you were present at any time at a meeting of the board of trustees where any vote was taken; if so, state what was the question voted on, and how was it voted? A. 16. I was not present when any vote was taken by the board, but was present when the resolution was read and an announcement made by the person who read the same that the board was unanimous and that the decision was final and that the resolution expressed the decision of the board.

"Q. 18. Were you present when a motion was put up by the President of the board of trustees or by the President of the College, or by any presiding officer of the board at the time, or when any motion, measure or action of the board of trustees was discussed, debated or acted upon? If so, state what it was, what discussion was had, who spoke and what vote was taken? A. 18. Nothing further than the discussion by the board when I made my report of my plans for the ensuing year, on June 5th, at which time each member seemed to be well pleased."

"Exhibit A," referred to in the deposition of Mary P. Brookfield, is a communication by the Board of Trustees to the President and Faculty of the College, showing an effort on the part of the board of trustees to adjust certain differences that had arisen between the President on one side and some of the Faculty on the other. The material portions thereof are as follows:

"1.  We would have all recognize frankly and cordially that the supreme authority of the College lies, not in its President, its Faculty, or its Alumni, but in the board of trustees. We cannot divide or vacate that authority. In its discharge we shall not be unmindful of the position of the Faculty, the province of the President, or the interest of the Alumni, and we shall, with a high sense of the trust reposed in us, seek to guard all the sacred interests of the institution.

"2.  .  .  . To foster or to recognize any divisive spirit, to suggest that the President or any member of the Faculty set his face away from the College at its crucial hour, cannot be for a moment by us considered. While we cannot control individual action, we protest vigorously against any further disintegration of the present teaching force.

"We believe that loyalty to Drury, a reasonable regard for the historic spirit of the College, and a desire to preserve all that is best in its heritage and to secure for its future the largest resources and the broadest outlook, will lead each one to minimize to the last degree all present differences, many of which we believe would be incidental to any change of administration, and to co-operate to the extent of his power in making the next year at Drury a year of advance and not of retreat, of victory and not of defeat."

"Exhibit B," offered by plaintiff, is a letter dated July 5, 1907, requesting the resignation of Mary P. Brookfield, which is in part as follows:

139 App—23

"Dear Miss Brookfield:

"The Executive Committee of Drury College at its meeting of July 3, 1907, in accordance with instructions given by the board of trustees, at the meeting of that body in St. Louis on June 18th, after careful consideration, decided that the best interests of the College and yourself require an immediate severance of your connection with the institution. It is believed by the members of the board that the spirit and purpose of the institution and the atmosphere of its environment are not consistent with the educational ideals to which you have been accustomed. They believe also that the peculiar conditions which at present surround the College would make effective service especially difficult for you and that a continuation of your position there would result in disappointment to you and its constituency. . . .       Very respectfully,

"E. M. Sheppard, Acting President.
"J. T. White, Chairman Executive Com.
"W. C. Calland, Secretary."

"Exhibit C," offered by plaintiff, is a letter dated July 20, 1907, again requesting the resignation of Mary P. Brookfield, part of which is as follows:

"Dear Miss Brookfield:

"On receipt of your letter of July 16th, I called a meeting of the Executive Committee of the College, which body directed me to write as follows:

"You were elected Dean of Women and Professor of English Literature of Drury College, with no time specified as to the length of your engagement. The College holds that it is its right to sever this relation at the end of any year when circumstances seem to justify such a change, just as you held the right to indicate that you wished to resign at the end of the second year of your service. Your work here is ended,

but your salary will continue until the first of September. . . . Very truly yours,

"EDWARD M. SHEPARD,
"Acting President."

"Exhibit D," offered by plaintiff, is as follows:

"July 27, 1907.

"Miss Mary P. Brookfield, Unionville, Michigan.

"Dear Miss Brookfield: The following is a minute adopted by the Executive Committee July 27, 1907:

"The Executive Board voted to authorize the Acting President and Secretary to officially notify Miss Mary P. Brookfield that her services will not be required after September 1, 1907. Very respectfully,

"E. M. SHEPARD, Acting President.
"W. C. CALLAND, Secretary."

Plaintiff then offered in evidence the Record of the College Trustees, page 152, which is as follows:

"June 6, 1906. Voted that Mary P. Brookfield be elected Dean of Women of Drury College at a salary of $1,000 and home."

Plaintiff also offered the Record of the College Trustees, page 165, dated June 5, 1907, which is as follows:

"It was voted by the board to refer the budget for the coming year to the Executive Committee and that the Executive Board endeavor to plan the expense so as not to exceed the income."

Plaintiff then offered in evidence the Record of the College Trustees showing the appointment of committees for the year 1907-8, which appears as follows:

"June 5, 1907. Committee-elect:

"Committee on Music and Art Department—Mary P. Brookfield and J. E. Kirbye."

Plaintiff also offered in evidence the Record of the College Trustees, page 174, dated August 17, 1907, which appears as follows:

"Be it resolved by the Board of Trustees that the action of the Executive Committee at meeting of July 3, 1907, in demanding the resignation of Miss Mary P. Brookfield as Dean of Women in Drury College is in full accord with the wishes of the Board of Trustees, as expressed at the Board meeting held June 18, 1907, and said action by said Executive Committee. It is here now in all things approved and confirmed."

John Turner White, being examined as a witness for the defendant, testified in part as follows:-

"Q. You are a member of the Board of Trustees of Drury College?  A. Yes, sir.

"Q. And were in June, 1907?  A. I was.

"Q. Were you present at the Board meeting of June 5th and 6th of last year?  A. I was, at all the sessions. I was at every session, beginning with June 6th, in the morning about eight o'clock, lasting all that day and nearly all that night and the next day until nearly six o'clock in the afternoon.

"Q. That is, the 6th and 7th inclusive?  A. Yes, sir.

"Q. And on the 5th?  A. No, the 5th and 6th; not on the 7th.

"Q. Now the resolution of June 5th, will you state to the court what brought that resolution?  A. The resolution itself refers to a report of the Executive Committee. That report of the Executive Committee was the result of an investigation pursued by the Executive Committee to inquire into the conduct and administration of Dr. Kirbye. That report of the Executive Committee stated, in effect, that there was a hopeless disagreement between Dr. Kirbye and the older members of the faculty, those who had been on the faculty previous to his coming there. That his administration had been a failure, and that he couldn't get along with them, and that any reconciliation with Dr. Kirbye was utterly hopeless. I am quoting the words as nearly as I can. I wrote the report myself. . . .

"Q. Was the question of Miss Brookfield's employment for another year, or for any length of time, considered or discussed by the board at that meeting? A. It was not considered or discussed at any time during those sessions. Miss Brookfield was before the board twice. On the first day when she read her report; her report was partly in writing and partly verbal, reporting the condition of her department, and the work for the previous year. In that nothing I think was said to her, except possibly some questions asking her about the things that had transpired in order to get a more intelligible understanding of her report. The second time she was before the board was when she was called in with all of the members of the faculty, not only the members of the College faculty, but the Academy faculty; everybody connected with the institution was called in, and this proclamation constructed by one of the preachers of the board was read.

"Q. Was that proclamation considered by the Board as a contract of employment with Miss Brookfield, or any other member of the faculty?"

An objection to this question was sustained, but the witness said:

"I might say this. There was no re-employment of teachers at that time, of any teachers. We didn't re-employ any teachers at that time."

"Q. Did the board at this time have up the consideration of the employment of the faculty for the succeeding year? A. It did not, except the reference to the Executive Committee which I think is on the records there."

On cross-examination, the witness testified in part as follows:

"Q. Isn't it a fact that she was considered as employed for the coming year? A. It was not.

"Q. Wasn't the fact that they put her on committees for the coming year because she was expected to be employed there for the coming year? A. No, sir.

"Q. When you appointed Miss Brookfield on this committee for the coming year, didn't the Board of Trustees, of which you are a member, understand that you were going to keep her for the coming year? A. I recollect nothing about the appointment; I don't recollect it.

"Q. You understood she was going to teach another year? A. No, we didn't. There was nothing settled.

"Q. There was a Committee on Conservatory of Music and Art Department, composed of Mary P. Brookfield and J. E. Kirbye? A. Yes.

"Q. Now at the same meeting of the Board this Committee on Music and Art Department was appointed and Miss Brookfield was appointed on that. Now wasn't all of the committees up for consideration and didn't those persons appointed on those committees continue to serve for the coming year? A. I think they did as a rule. But that committee isn't provided for in the by-laws is my recollection."

W. C. Calland, being examined as a witness for the defendant, testified in part as follows:

"Q. You were for a great many years Secretary and Treasurer of Drury College? A. Yes, sir.

"Q. Retiring when? A. Retiring on the 11th of last June.

"Q. When was Commencement Day in 1906? A. I think it was the 5th or 6th of June.

"Q. And when was Commencement Day in 1907? A. I think it was about the 6th of June. I am not sure about that.

"Q. 1908, I mean? A. 1908, it was the 11th of June.

"Q. In 1907 it was the 6th? A. I believe so.

"Q. And in 1908 it was the 11th of June? A. Yes, sir.

"Q. Commencement Day is the last day of school, isn't it? A. Yes, sir; the day of graduation.

"Q. You were the Secretary of the Board in June, 1907? A. Yes.

"Q. Were you present when this proclamation of June 6th was read and discussed by the Board? A. Yes, sir.

"Q. Was the question of the employment of Miss Brookfield or the employment of teachers under discussion by the board at the time of the adoption of the resolution of June 6th? A. No, sir.

"Q. Was the question of the employment of teachers under discussion at that time? A. No, sir."

Upon cross-examination, the witness testified as follows:

"Q. When are these annual meetings of the Board held? What has been your rule since you commenced with the College about holding the annual meetings of the board of trustees? About what dates? How is that fixed; by by-laws or by a rule of the board? A. There is a statement in the by-laws there as to the time the annual meeting shall be held, and the commencement comes the first Thursday after the annual meeting. The annual meeting of the College—that is, the annual meeting of the Board — shall be held in Springfield, Missouri, on Wednesday immediately preceding the first Thursday in June.

"Q. Does that vary from time to time? A. I think it does.

"Q. Sometimes it is early in June, and sometimes later? A. Yes, sir.

"Q. Who fixes the termination of the school year; the Faculty or the board of trustees? A. The trustees.

"Q. They fix the date of the beginning of the school and the length of the term? A. Yes, sir.

"Q. And that by mathematical calculation fixes the time for Commencement? A. Yes, sir; on Wednesday after the annual meeting.

"Q. The Board fixes its own annual meeting? A. Yes, sir.

"Q. That varies sometimes a week or two? A. Yes, sir."

Upon redirect examination the witness testified:

"Q. When did Miss Brookfield begin work for the College? A. Miss Brookfield's term of services begun like every other new teacher. It began when the term begins, in September.

"Q. That would be September, 1906? A. Yes, her work and her salary begins in September.

"Q. And she was paid what? A. Twelve annual payments. The last payment was due in August, August following.

"Q. That would be for August, 1907? A. Yes, sir.

"Q. She was paid twelve monthly payments? A. Yes, sir."

On re-cross examination, the witness testified in part as follows:

"Q. If you have an old teacher, and at the annual meeting his place is filled for the following year, the one that goes out he wouldn't conduct the correspondence and the other necessary work there for the coming year? Wouldn't the new teacher take charge of that? A. Naturally the work of a teacher would expire in June and the arrangements for the next year would devolve upon other parties."

## OPINION.

NIXON, P. J.—It will appear from the foregoing evidence that the defendant, Drury College, is located in Springfield, Missouri, and that it was organized and constituted a body politic and corporate under the laws of Missouri, "for the purpose of promoting the higher education and Christian culture, by founding and forever maintaining a school of liberal learning." The en-

tire powers conferred upon the corporation, as appears
by its charter, were vested in and to be exercised by a
board of trustees of twenty members, of which seven
members should constitute a quorum to transact busi-
ness.

In May of the year 1906, the plaintiff was a teacher
and graduate student residing in Chicago, Illinois, and
was an educator of eighteen years' experience.    Dr.
Kirbye was then President of Drury College.   He called
on her at her home, and according to her statement,
offered her the position of Dean of Women at Drury
College for two years at a salary of $1,000 per year
and a home at M'Cullagh Cottage.  She took the matter
under advisement, and sometime in June of that year,
was notified by President Kirbye that she had been
elected to the position by the board of trustees of the
College at its annual meeting on June 6th.   In response
to such notice, she telegraphed her acceptance.   She
says that her agreement with President Kirbye was for
two years' employment as teacher in the College, but
as will hereafter be seen, when she was elected to the
position by the board of trustees, no time was specified.
The duties of the position as Dean of Women required
that she should have charge of the young ladies in the
College and professional supervision over their studies,
and she was also to be a teacher of English Literature.
She was informed before her services commenced that
the board of trustees had never been in the habit of
making written contracts with teachers, and that the
election by the board of trustees at their annual meeting
was final.

About the time when school commenced at the Col-
lege in 1906, she came to Springfield, entered the employ
of the College, assumed the duties of the position to
which she had been elected, and was given a home in
McCullagh Cottage.   She continued to discharge her
duties from that time until the time when she was
removed by a letter from the executive committee, dated

July 5, 1907, in which she was notified to immediately sever her connection with the institution, and in which it was stated:

"The executive committee of Drury College at its meeting of July 3, 1907, in accordance with instructions given by the board of trustees, at the meeting of that body in St. Louis on June 18th, after careful consideration, decided that the best interests of the College and yourself require an immediate severance of your connection with the institution. It is believed by the members of the board that the spirit and purpose of the institution and the atmosphere of its environment are not consistent with the educational ideals to which you have been accustomed. They believe also that the peculiar conditions which at present surround the College would make effective service especially difficult for you and that a continuation of your position there would result in disappointment to you and to its constituency."

The following entry also appears on the records of the board of trustees in relation to her removal:

"Be it resolved by the board of trustees that the action of the Executive Committee at meeting of July 3, 1907, in demanding the resignation of Miss Mary P. Brookfield as Dean of Women in Drury College is in full accord with the wishes of the board of trustees, expressed at the board meeting held June 18, 1907, and said action by said executive committee. It is here now in all things approved and confirmed."

Her original employment—so-called—is evidenced by an entry on the minutes of the board of trustees which is as follows:

"June 6, 1906. Voted Mary P. Brookfield be elected Dean of Women of Drury College at a salary of $1,000 and home."

From September 1, 1906, to September 1, 1907, her salary was paid her by monthly installments of $83.33 1-3, the last payment being made in October, 1907.

The annual meeting of the board of trustees was held on the 6th and 7th of June, 1907. At this meeting, she was before the board and made a report of her stewardship as dean and laid before the trustees her plans for future work.

## I.

It is claimed by the plaintiff in her petition that in June, 1907, the defendant corporation made a contract whereby it hired her for a period of one year ensuing, and the trial court found that her contract was for just one year commencing at the annual meeting of the board in June, 1907.

The most careful examination of the evidence as to what was said and done at the meeting in June, 1907, reveals no such contract. It is claimed that certain resolutions were read, the acceptance of which by the plaintiff constituted the said contract. The significance of these resolutions, in the light of the surrounding circumstances, cannot be misunderstood. The resolutions speak in no uncertain tone. They contain the final decision of the board relating to the troubles of Drury College. A crisis had arisen in the government of the institution and the supreme authority of the board of trustees, given by its charter to manage the affairs of the College, had been challenged. Rival factions were struggling against each other for control, a divisive spirit had grown strong, and Drury College was threatened with disintegration. To quell this spirit and bring about harmony and unity in the management of the institution was the purpose of the resolutions. All the faculty and other officers of the College were called before the board at this meeting, and these resolutions were read to them as the final views of the board. They exhorted the officers and servants of the institution, one and all, to loyalty to Drury; asked them to preserve the historic spirit of the institution and all that was best in its history, by making the ensuing

year a year of advance and not of retreat, of victory and not of defeat. There can be no misconstruction of these resolutions, and there is no ground to contend that they contain any contract whatever as to the employment of teachers of the institution.

At that meeting when the board of trustees made up their committees for the coming year, the plaintiff was appointed on the committee of conservatory of music and art department. She says in this connection, that after the resolutions were read, she was desirous of continuing her employment in the College and consented to remain, and continued her preparations for the coming year.

Whatever any person may have said at the time of this meeting as to the contents of the resolutions can receive no consideration at our hands. The resolutions that were read at the meeting are in evidence and this court is to construe them, whatever may have been said by other persons at the time as to their contents. They certainly contain no language that can be construed as an employment of the plaintiff for one year from June, 1907, to June, 1908.

It is to be recalled in this connection that at the previous annual meeting, plaintiff had been elected for an indefinite term of service, and up to the second annual meeting, she had never been re-employed or discharged. These resolutions did not change the plaintiff's existing indefinite employment as teacher into a definite employment to begin at a certain time and end at a certain time; much less do they constitute a re-employment for a calendar year commencing in June, 1907. What was said and done by the plaintiff and others at that meeting, so far as it had any relation to the employment of teachers, was simply and solely a recognition and ratification of an existing status of things and not an attempt to make a new contract; nor was it a re-employment. She had been in the service of the defendant as Dean of Women, was still acting in

that capacity, and these resolutions, at the utmost, only recognized that she was still to continue in that position. Such being the case, her contract continued to be one for an indefinite period of time. The law in this State has been well stated that an indefinite hiring at so much per day, or per month, or per year, is a hiring at will and may be terminated by either party at any time and no action can be sustained in such case for a wrongful discharge. [Finger v. Brewing Co., 13 Mo. App. 310; Evans v. Railroad, 24 Mo. App. 114; Harrington v. Brockman Commission Co., 107 Mo. App. 418; see also, Greenway v. Early, 23 N. Y. Suppl. 1009; De Briar v. Minturn, 1 Cal. 451.] In Volume 26 of the Cyclopedia of Law and Procedure, it is stated: "In the United States, a general or indefinite hiring is presumed to be a hiring at will." All the evidence is consistent with an indefinite hiring of the plaintiff except her own testimony.

There seems to be some ambiguity in this case as to the meaning of the word "year," as used in the resolutions and in the evidence, as well as in the meaning of the word "commencement." These words, when used by educators and teachers, have a special meaning. The word "year," when so used, without any qualifying clauses, means a college year and not a calendar year. The word "commencement" does not mean the commencement of the college year, according to American usage, but does mean the last day of the college year when the honors and degrees of the institution are conferred upon the graduating class. [Century Dictionary, "Commencement."]

The commencement—or last day in the college year —in Drury College for the year 1908 was June 11th. The board of trustees, as a part of their duties, at each annual meeting fixes the time of their next annual meeting, thereby fixing the date of commencement day for the ensuing year (under the provisions of the charter). In the absence of other evidence, the law presumes that

at the annual meeting in June, 1907, the trustees discharged this duty and thereby fixed commencement day for the ensuing year as June 11, 1908. It is the presumption of law that the usual and ordinary course of business has been pursued in a business tranaction. [Ivy v. Yancey, 129 Mo. 501; Long v. Joplin Mining & Smelting Co., 68 Mo. l. c. 431.]

If the plaintiff was employed at the meeting of the board in June, 1907, for a year—meaning a college year—her term would expire on commencement day, 1908, a period of one calendar year and five days after the making of the contract. This would bring the contract, according to the authorities hereinafter cited, within the meaning of the Statute of Frauds.

## II.

Considered from another viewpoint, the plaintiff's case is condemned by her own evidence; she has given her construction of the so-called contract, which, if believed, brings the case clearly within the Statute of Frauds. She testified that her work under this contract of June, 1907, was to continue until the opening of school in September, 1908: "I did not consider that my work had ended and would not until September, 1908." "My understanding would be that my first year under the agreement did not end until the opening of school in September, 1907." Her evidence became the more important from the fact that it was the only oral evidence offered in her behalf that undertook to fix precise time limits to her contract.

The law of evidence as to admissions and statements of a party to the record and in interest, when made contrary to his attitude on the trial, or as to admissions negativing the averments made in his petition, is that such admissions are competent evidence against him whenever or wherever made. [Steinberg v. Insurance Co., 49 Mo. App. 255; Padley v. Catterlin, 64 Mo. App. l. c. 641; Schradski v. Albright, 93 Mo. 42; Kritzer

v. Smith, 21 Mo. 296; Charleston v. Hunt, 27 Mo. 34; State v. Bank, 80 Mo. l. c. 633; Pomeroy v. Benton, 77 Mo. 54; Bogie v. Nolan, 96 Mo. 85.]

It is not essential to constitute a statement of a party an admission that such party should have personal knowledge of the facts admitted. Where a party believes a fact to be true, upon evidence sufficient to convince him of its truth, his statement of such a fact, if against his interest, is admissible. [Sparr v. Wellman, 11 Mo. 230; Erskine v. Loewenstein, 82 Mo. l. c. 308.]

In the case under consideration, plaintiff's evidence should have been restricted to a statement of the facts. It was not competent for her to give her conclusions as to what the contract was and thereby bind the defendant. It was the province of the court, from the facts, to draw such conclusion. [Sparr v. Wellman, supra.] But having stated her conclusion, it was evidence against her.

If the contract was therefore as she has stated it, it would fall within the statute of frauds. There can be no claim made under the evidence in this case that there was a compliance with the Statute of Frauds. The language of the statute (section 3418, R. S. 1899) is as follows:

"No action shall be brought to charge . . . any person . . . upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized. . . ."

The only suggestion of a memorandum of her contract is the minutes on the records of the board of trustees of June 6, 1906, and the written resolutions read at the annual meeting of June 6, 1907. As to both of these memoranda—if such they can be called—it is sufficient to state that they wholly fail to set forth

the terms of the contract of hiring, when it should commence, when it should end, how and when the payments were to be made and the nature of the services to be performed. Such memoranda cannot be pieced out by parol evidence so as to make out the contract set out in plaintiff's petition. The introduction of parol evidence in such cases is the very mischief which the Statute of Frauds seeks to remedy. The memorandum must contain the entire contract. [Ringer v. Holtzclaw, 112 Mo. 519; Kelley v. Thuey, 143 Mo. 422; Rucker v. Harrington, 52 Mo. App. 481; McKeag v. Piednor, 74 Mo. App. 593; Bruckman v. Hargadine-McKittrick Dry Goods Co., 91 Mo. App. 454; Biest v. Ver Steeg Shoe Co., 97 Mo. App. 137; Darnall v. Lafferty, 113 Mo. App. 282 and cases cited.]

As to these resolutions, there is no evidence that they were signed by the party to be charged, the evidence being that no record of them was made, and they were not signed by any person. The fact that her services could have been completed within one year after such services were to be commenced, does not relieve the contract from the effect of the Statute of Frauds. The year, designated by the statute, commences from the date of the agreement and ends at the time its performance was to be completed; and although the contract might be completed within one year from the time that its performance was to commence, this does not take it out of the Statute of Frauds. [Sharp v. Rhiel, 55 Mo. 97; Briar v. Robertson, 19 Mo. App. 66; Cook v. Redman, 45 Mo. App. 397; Chase v. Hinkley (Wis.), 105 N. W. 230, 2 L. R. A. (N. S.) 738; see also note, 2 L. R. A. (N. S.) 738.]

We conclude from the survey of this case that the board of trustees of Drury College were, under the contract made with the plaintiff, vested with the authority to remove her. For the proper protection of the high interests with which they are intrusted and for the proper discharge of the great trust vested in them—

while acting in good faith in her removal—they are responsible only to the founders and patrons of Drury College and to their own consciences.

The demurrer to the evidence should have been sustained by the trial court. The case is accordingly reversed. All concur.