PENOBSCOT AND KENNEBEC RAILROAD COMPANY *vs.* SIDNEY
BARTLETT, Executor.
SAME *vs.* JOSEPH M. WHITTIER.

A contract made in this state to subscribe to shares in the capital stock of a railroad corporation established by the laws of another state, and having their road and treasury there, is a contract to be performed there, and is to be construed by the laws of that state.

Under the Rev. Sts. c. 94, § 60, at the argument before this court upon a report which shows that at the trial one of the parties referred to the decisions of the courts of another state, he may prove the law of that state by citing the books of reports of decisions of those courts.

A contract " to take and fill " a certain number of shares in the capital stock of a railroad corporation established in Maine, which by its charter is to consist of not less than four thousand nor more than ten thousand shares, upon condition that " the corporation may organize when four thousand shares shall have been subscribed, but no contract for the building and completing the road shall be entered into until seven thousand shares have been subscribed," renders the subscriber liable after four thousand shares have been subscribed and the corporation has been organized and passed a vote to dispose of the residue of the capital stock authorized by the charter, although no other vote has been passed fixing the amount of the stock and the ten thousand shares have not been taken.

ACTIONS OF CONTRACT against the executor of the will of Benjamin B. Mussey, and against Whittier, to recover assessments laid and notified according to the plaintiffs' by-laws since July 1853 upon the shares in their stock, which the defendants had, early in 1853, at Boston, signed an agreement in writing " to take and fill " on the following terms and conditions : " Whenever any assessment upon said shares shall be called for by the directors of said corporation, every shareholder shall have the right to pay into the treasury the amount of one hundred dollars on each share, including previous payments, and shall be thereafter entitled to interest at the rate of six per cent. per annum, payable semiannually from the treasury upon the stock so paid in full, until the last assessment shall be called for and payable." " The corporation may be organized when four thousand shares shall have been subscribed, but no contract for the building and completing the road shall be entered into until seven thousand shares shall have been subscribed."

Trial before *Thomas,* J., who directed verdicts for the defend-

ants, subject to the opinion of the whole court upon this report:

The plaintiffs offered in evidence their act of incorporation, passed in Maine on the 7th of April 1845, the 76th and 81st chapters of the revised statutes of that state, the records of their stockholders and directors, and the original books of subscription; and referred to the several decisions of the supreme court of Maine, with a view of showing what the law of Maine was.

From the stockholders' records it appeared that on the 27th of November 1856, when the meeting of the stockholders was called for organization, four thousand and sixty seven shares had been subscribed for; that the act of incorporation was then accepted, the subscribers made associates by express vote, by-laws adopted and officers chosen; that among the powers given to the directors by the seventh article of the by-laws was one of disposing " of the residue of the capital stock authorized by the charter and not subscribed for at the time of the organization, in such manner, at such times and from time to time as they shall judge meet for the interests of the company;" that the directors took steps to carry out this vote; that the plaintiffs made no contracts for the building of their railroad until after more than seven thousand shares had been subscribed for; that on the 2d of May 1853 it appeared that nine thousand and sixty six shares had been taken, and that at the meeting in July 1853, eight thousand nine hundred and seventy seven votes were cast for officers of the corporation. It did not appear that the stockholders established the amount of the capital stock of the corporation by any other vote than the above.

*H. W. Paine & G. D. Porter,* for the plaintiffs.

*C. E. Pike & D. Thaxter,* for the defendants. 1. The contract having been made in Boston, is governed by the law of Massachusetts. *Carnegie* v. *Morrison,* 2 Met. 381. Story Confl. § 293 & note. The contract is silent as to the place of performance, and the ordinary presumption is that it is to be performed here. But that is immaterial; for the *lex loci contractus* will determine whether the contract is valid, and, if so, what its construction and interpretation shall be; although the

manner and mode of its execution may have to be determined by the place of performance.

2. By the law of Massachusetts the agreement of the defendants was a promise to pay for certain shares in the plaintiffs capital stock when the number of shares of which such stock is to consist should be legally fixed and determined, and taken up by *bona fide* subscriptions. *Salem Milldam* v. *Ropes,* 6 Pick. 23, and 9 Pick. 187. *Central Turnpike* v. *Valentine,* 10 Pick. 142. *Cabot & West Springfield Bridge* v. *Chapin,* 6 Cush. 50. *Worcester & Nashua Railroad* v. *Hinds,* 8 Cush. 110. *Stoneham Branch Railroad* v. *Gould,* 2 Gray, 277. *Troy & Greenfield Railroad* v. *Newton,* 8 Gray, 596.

3. If the law of Maine is to govern this case, there is no proof of any law of Maine conflicting with our own law. The report finds that the plaintiffs "referred to several decisions of the supreme court of Maine," but does not state what those cases were. Rev. Sts. c. 94, § 60. 1 Greenl. Ev. §§ 480–488. Story Confl. § 642. In the absence of sufficient proof, the law of Maine is presumed to be the same as our own. *Legg* v. *Legg,* 8 Mass. 99. *Whidden* v. *Seelye,* 40 Maine, 247. And the cases in the Maine Reports, if referred to, do not differ from our own, but turned upon different forms of subscriptions.

BIGELOW, J. We have not deemed it necessary to determine whether the contract of subscription on which the plaintiffs rely would be valid and binding under the laws of Massachusetts, because we are of opinion that the validity, obligation and interpretation of the contract must be governed by the law of the State of Maine. Although the contract was made in Boston, that is, it was executed by the defendants here and no place was designated in express terms for its performance, yet in order to ascertain and determine the law by which it is to be interpreted and governed, we must look at its nature and character, the purpose for which it was made and the objects intended to be accomplished by it. This is the only mode by which we can judge accurately of the intent of the parties, and arrive at a correct conclusion on the question whether the contract was to be performed at the place where it was made, or in another place

subject to a different jurisdiction, and where a different rule of interpretation may prevail.  In the case at bar, we cannot doubt that the place of performance of the contract was in the State of Maine, and that it was so understood and intended by the parties.  It was a contract of subscription to the capital stock of a railroad corporation established by the legislature of that state. The road to be constructed under the authority of the charter was located wholly within the limits of that state.  The duties of the officers of the corporation were to be chiefly performed there.  Its capital stock was to be there expended and its treasury to be there situated.  Although by the terms of the charter the corporation was authorized to open books of subscription to its capital stock in the cities of Salem and Boston as well as in the State of Maine, there is no provision designating the place where the payment of such subscriptions was to be made.  It being a foreign corporation established for local purposes, we think the necessary implication is that payment was to be made in the State by whose laws the corporation was established, and where its business was to be carried on and its officers chosen. It cannot be reasonably supposed, in the absence of any express stipulation, that its financial concerns would be carried on under a foreign jurisdiction.  When therefore by the terms and conditions of the subscription it was stipulated that subscribers should have the right " to pay into the treasury " the whole amount of their subscription and be entitled to interest thereon, payable semiannually from the treasury, we think it clearly appears to have been the intention of the parties that the subscrip tions should be payable in the State of Maine.  It may be safely said, that where a party resident in one state agrees to pay money towards the capital stock of a corporation established by the laws of another state and having its place of business there, according to assessments to be laid by the directors, it is equivalent to an agreement to pay such sums to the treasurer of the corporation or other duly authorized agent; and where no place of payment is specified, it must be presumed to have been the intention of the parties to pay such assessments in the State where the corporation is established and carries on its business.

The rule is familiar, that if a contract either expressly or by implication is to be performed in a place other than that where it was executed, then, according to the presumed intent of the parties, its validity, obligation and interpretation are to be gov erned by the law of the place of performance. Story Confl. § 280., The law of the place where the contract is made can never be the rule of its interpretation, if it is entered into with a view to the law of another country or state.

It was urged in argument that there was no evidence before the court concerning the laws of the State of Maine regulating and governing contracts of this nature, and that therefore the presumption is that the law of that state is similar to our own. But we do not so understand the case as stated in the report. By that it appears that the counsel for the plaintiffs, in proving their case, referred to the several decisions of the supreme court of the State of Maine, for the purpose of showing what the law of Maine on the subject is. It does not appear that any objection was made at the trial by the defendants to this evidence of the law. But if there had been, we do not think it tenable, because by the Rev. Sts. *c.* 94, § 60, it is provided that the unwritten or common law of any other of the United States may be proved as facts by parol evidence, and that the books of reports of cases adjudged in their courts may also be admitted as evidence of such law.

Upon reference to the decisions of the supreme court of the State of Maine, relating to subscriptions to the capital stock of corporations, in which the subscribers have agreed, in terms like those embodied in the contract declared on, to " take and fill " a certain number of shares, it appears that they have been construed as contracts to take and pay for the shares on which the subscribers are liable as on an express promise. Certainly, as an original question, we should have had great doubts of the correctness of the interpretation. But it was long since determined to be the true one by the supreme court of the State of Maine, in *Bangor Bridge* v. *McMahon,* 1 Fairf. 478. This decision has been subsequently recognized as a true exposition of the terms of the contract by the same court, and it was recently

reaffirmed in an action brought in favor of the plaintiffs on a subscription expressed in the same terms as those contained in the contract declared on. *Buckfield Branch Railroad* v. *Irish,* 39 Maine, 44. *Penobscot & Kennebec Railroad* v. *Dunn,* 39 Maine, 588.

It is however urged with great confidence in behalf of the de-fendants, that the agreement signed by the defendants amounts only to a promise to pay for the shares when the number of shares of which the capital stock is to consist shall be legally fixed and determined and taken up by *bona fide* subscriptions, and that there is no provision in the charter of the plaintiff cor-poration, nor any vote of the directors or of the corporation by which the capital stock is fixed and limited. This objection rests on the rule of law as recognized and established in this commonwealth by a long series of decisions, commencing with *Salem Milldam* v. *Ropes,* 6 Pick. 23, in which it is held that where the capital stock of a corporation is fixed by its charter, or is to be determined by a by-law or by vote of the directors, no agreement to pay for shares is binding until the whole capital, stock fixed in the charter is taken up, or until the corporation or the directors have determined on the number of shares and the whole number is subscribed for. But in the present case, the capital stock of the corporation is not fixed by the charter, nor is there any provision requiring the corporation or directors to determine its amount. The only provision is that contained in § 3, which enacts that the capital stock shall consist of not less than four thousand or more than ten thousand shares. By one of the conditions of the subscription, it was provided that the corporation might be organized when four thousand shares should have been subscribed for, but no contract for building and completing the road should be entered into until seven thousand shares should have been subscribed for. It appeared in evidence at the trial that when the corporation was organized in November 1852 four thousand and sixty shares had been taken, that on the 3d of May 1853 nine thousand and sixty six shares had been subscribed for, and that no contract for con-structing the road was made until more than seven thousand

shares had been taken. The conditions of the subscription were thus completely fulfilled.

We understand it to have been decided in *Penobscot Railroad* v. *Dummer*, 40 Maine, 172, that under a charter similar in its terms to that under which the plaintiffs act, providing that the capital stock should consist of not less than one thousand and not more than six thousand shares, a subscriber was held liable on his contract " to take and fill " a certain number of shares, when more than one thousand, to wit, twelve hundred and ten shares had been taken ; and in *Kennebec & Portland Railroad* v. *Jarvis*, 34 Maine, 360, under an act incorporating a railroad company, with a provision that the capital stock might consist of one million two hundred thousand shares, and where the corporation had passed a by-law that there should be twelve thousand shares of one hundred dollars each, the number of which might be increased by the directors, it was decided that a subscriber was liable on his subscription although the number of shares fixed by the by-law had not been taken up.

These decisions establish beyond doubt that by the law of the State of Maine the subscription relied on in the present case would be held binding and obligatory on the defendants. And if anything is required to make this more clear, it may be added that in an action by these plaintiffs on the·same subscription paper as that declared on in this action, it was held to be a valid contract on which the subscriber was liable for the amount of his subscription. *Penobscot & Kennebec Railroad* v. *Dunn*, 39 Maine, 587. It is true that the precise point discussed here was not raised in that case, but it was argued by eminent counsel, and if there had been any validity in the objection under the law of the State of Maine, it would doubtless have been raised.

*Verdict set aside; judgments for the plaintiffs.*